IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DAVID LEE                    :         CIVIL ACTION
                             :
        v.                   :
                             :
VALLEY FORGE MILITARY ACADEMY :        NO. 08-527

_____ MEMORANDUM

Dalzell, J.                              November 14, 2008

        Plaintiff David Lee sued his former employer, Valley

Forge Military Academy ("VFMA")[1], for violating the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et

seq., and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.

Cons. Stat. Ann. § 955, for allegedly terminating his employment

because of his age.  VFMA has moved for summary judgment, and we

now resolve that motion.


I.   **Factual Background**

        VFMA hired Lee to be an Officer-in-Charge ("OIC") on

April 3, 2006.  Def.'s Mem. Ex. D.  An OIC is responsible for

providing security on the grounds of the VFMA campus.  Id. Ex. F

_____

        [1]VFMA is a college preparatory boarding school serving
middle and high school age boys.  It is associated with the
Valley Forge Military College, a two-year, post-secondary
educational institution, and is located on a 120-acre campus in
Wayne, Pennsylvania.  Valley Forge Military Academy,
Administration Mission, http://www.vfmac.edu/
administration_mission.html.

[Doyle Dep.] at 12-13.  Before becoming an OIC, Lee was in the
Navy, and then became a Philadelphia police officer; Lee had also
worked in the Philadelphia Sheriff's Department.  <u>Id.</u> Ex. G [Lee
Dep.] at 29-30.  He had about twenty-seven years of law
enforcement experience, and was certified by the Philadelphia
Police Department as an instructor in Management of Aggressive
Behavior.  <u>Id.</u>  Lee was forty-nine years old when he worked for
VFMA.  <u>Id.</u> at 7.

On November 3, 2006 at about 11:15 p.m., Lee and a VFMA
cadet had an altercation.  Def.'s Mem. Ex. H, I.  The cadet was
in an agitated state after having a difficult conversation with
his family.  Doyle Dep. at 30-31; Def.'s Mem. Ex. H, I.  The
cadet and his roommate had gone to see the VFMA Commandant to
talk about the cadet's various problems.  <u>Id.</u>  After not finding
the Commandant in the building, they headed back to their
barracks.  <u>Id.</u>  They were not in regulation uniforms, and when
they were almost to their barracks, they ran into Lee, who was
driving back from VFMA's front gate.  Doyle Dep. at 30-31; Def.'s
Mem. Ex. H, I; Lee Dep. at 46-50;

What exactly occurred between the cadet, his roommate,
and Lee is uncertain.  The cadet and his roommate contend that
Lee pulled up to them and yelled, "Why the fuck are you in that

2

uniform, boy?"[2]  Def.'s Mem. Ex. H, I.  The cadet fired back with his own round of vulgarities, and Lee got out of his vehicle. Id.  The cadet and his roommate contend that Lee got into the cadet's face and began taunting him.  Id.  The cadet's roommate tried to get between them, but Lee pushed him out of the way. Id.  The cadet then hit Lee in the face, and pushed him over a small wall.  Id.

        Lee, on the other hand, contends that he did not curse at the two boys, but instead asked why they were dressed the way they were and out at that particular hour.  Lee Dep. at 46-50; Def.'s Mem. Ex. H, I.  On Lee's account, the cadet in response began cursing at him, so he got out of the car to try and convince them to get them to go back into their barracks.  Id. But the cadet was too agitated and refused to comply.  Id.  The cadet then began screaming in Lee's face, and poking him in the shoulder.  Id.  When Lee told him to desist, the cadet's roommate got between them.  The cadet then hit Lee and pushed him over a small wall.  Id.

        Both versions of events agree that the cadet followed

_____

        [2]The roommate's statement reports that Lee said, "Why the fuck! [sic] aren't you in the right uniform?"  Def.'s Mem. Ex. H, I.

3

Lee over the wall and ended up on top of him.  Id.  They
scuffled, and Lee grabbed the cadet by the neck to restrain him
until other cadets came out to break up the fight.  Id.  The
cadet was taken inside after initially refusing to go, and
eventually calmed down.  Id.

　　　　The VFMA chain of command promptly learned of the
incident and conducted two parallel, formal investigations: one
conducted by Col. Kenneth Seitz, Lee's supervisor, and the other
by Commander Rodney Hill.  Def.'s Mem. Ex. H, I.  VFMA commenced
the investigations on November 7, 2006.  Id.  Both investigators
had Lee's, the cadet's, and his roommate's written statements
from the night of the incident.  Id.  They interviewed these
three again, and also spoke with six other cadet witnesses and
one Tactical Officer.  Id.  Most of the witnesses saw very
little, but almost all stated that they heard people shouting
outside the building.  Id.  Two of the cadet witnesses stated
that they heard Lee provoke the cadet.  Id.

　　　　Both reports were completed on November 13, 2006.  Id.
Hill's report recommended that the cadet be brought before the
VFMA Board for the assault on Lee and that Lee be terminated for
"allow[ing] himself to be drawn into an angry confrontation with
a teenager, which resulted in physical contact with two cadets."

Id.  Seitz's report, on the other hand, recommended that Lee be counseled, and the cadet dismissed.  Id. Ex. I.

These reports were given to VFMA's Superintendent, Col. (Ret.) J.J. Doyle, who reviewed them, and essentially adopted Hill's recommendations: Doyle advised the VFMA President on November 14, 2006 that the cadet ought to be brought before the VFMA Board and Lee should be terminated.  Id. Ex. H, I.  The President followed Doyle's advice, and Doyle issued a memorandum conveying the President's decision to VFMA's Commandant on November 16, 2006.  Id.

While Lee was a VFMA employee, his son attended the high school as a junior at a reduced tuition rate.  Lee Dep. at 64-65.  When VFMA terminated Lee, they offered Lee the option of having his son stay on at the reduced rate if Lee would sign a release.  Id. at 60.  Lee refused, and his son left VFMA.  Id. VFMA did not transfer his credits, so Lee's son was forced to complete his junior year at another school.  Id. at 61.

During his deposition, Lee testified about several other incidents at VFMA in which younger VFMA employees were involved in fights or heated verbal disagreements with cadets. He testified that another OIC, Alexander Robbins, got into a heated argument with some cadets, which did not result in

5

physical contact, and for which VFMA did not terminate him.  Id.
68-69.  Lee testified that OIC Charles Kane, who was the longest
serving OIC at VFMA, told Lee that, with no details reported, he
had gotten into several "altercations" with cadets, but was never
fired.  Id. at 67-68, 72-73 (Kane "had had altercations with
cadets," id. at 73).  OIC Kane also told Lee that Kane had once
yelled at some cadets who were in the shower room "to get out of
there before he came in and butt-fucked them up their ass."  Id.
at 67-68.  Lee also testified that Kane stated that he had gotten
into a fight with a Tactical Officer[3] at the college that
resulted in the Tactical Officer going to the hospital and VFMA
firing the Tactical Officer.  Id. at 73-74.

Lee testified that he was involved in what he referred
to as the "pizza incident."  Id. at 69-70.  One Tactical Officer
organized a group of cadets to patrol the campus to make sure
that other cadets were not sneaking off campus.  Id.  One day
these cadets intercepted the delivery of eight pizzas on their
way to the football team.  Id.  The Tactical Officer took the
pizzas and threw them in the dumpster.  Id.  The football team

---

[3]Tactical Officers, as opposed to OIC's, are directly
responsible for managing the cadets and acting "in loco
parentis."  Doyle Dep. at 13.

6

confronted the Tactical Officer about their missing pizzas and
demanded compensation.  Id.  The situation escalated and other
OICs came to try to calm the situation down.  Id.  The encounter
finally ended when the Tactical Officer got the Commandant, who
arrived drunk, and somehow got everyone to go back to where they
belonged.  Id.

      Sometime in early November, Alfredo Gonzalez, an
alumnus of the institution and a former OIC, emailed VFMA.
Def.'s Mem. Ex. M, N [Gonzalez Dep.] at 11.  Gonzalez, who was in
his late twenties or early thirties, had worked at VFMA from 2004
until 2006, but left to pursue a career in the culinary arts.
Gonzalez Dep. at 9-10.  In late 2006, Gonzalez was having
problems with his employer, and got in touch with VFMA sometime
in early November of 2006 to find out if there were any openings
for his old job.  Id. at 10.  VFMA responded positively to his
inquiries, and there was some back and forth during the course of
November of 2006.  Id. at 11-12; Def.'s Mem. Ex. M.  In the end,
Gonzalez resolved his issues with his employer, and ceased his
discussions with VFMA.  Gonzalez Dep. at 13.

      Gonzalez contacted VFMA again on January 21, 2008, and
again asked whether his old job was available.  Id. at 14.  Again
VFMA responded positively to his inquiry.  Id.  VFMA ultimately

7

hired Gonzalez as a Tactical Officer in March of 2008.  Id. at

15-16.


## II.  Analysis[4]

      Lee brings claims for violation of the ADEA and PHRA,

---

[4]Summary judgment is appropriate if there is no genuine
issue of material fact and the moving party is entitled to
judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In ruling
on a motion for summary judgment, the Court must view the
evidence, and make all reasonable inferences from the evidence,
in the light most favorable to the nonmoving party.  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Whenever a
factual issue arises which cannot be resolved without a
credibility determination, at this stage the Court must credit
the non-moving party's evidence over that presented by the moving
party.  Liberty Lobby, 477 U.S. at 255.
    The moving party bears the initial burden of proving that
there is no genuine issue of material fact in dispute.
Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S.
574, 585 n.10 (1986). Once the moving party carries this burden,
the nonmoving party must "come forward with 'specific facts
showing there is a genuine issue for trial.'" Matsushita, 475
U.S.  at 587 (quoting Fed. R. Civ. P. 56(e)).  The non-moving
party must present something more than mere allegations, general
denials, vague statements, or suspicions.  Trap Rock Indus., Inc.
v. Local 825, 982 F.2d 884, 890 (3d Cir. 1992); Fireman's Ins.
Co. of Newark v. DuFresne, 676 F.2d 965, 969 (3d Cir.1982).  It
is not enough to discredit the moving party's evidence, the non-
moving party is required to "present affirmative evidence in
order to defeat a properly supported motion for summary
judgment." Liberty Lobby, 477 U.S. at 257 (emphasis in original).
A proper motion for summary judgment will not be defeated by
merely colorable or insignificantly probative evidence. See
Liberty Lobby, 477 U.S. at 249-50.  Also, If the non-moving party
has the burden of proof at trial, then that party must establish
the existence of each element on which it bears the burden.
Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

alleging that VFMA terminated him because of his age.  We analyze
PHRA and ADEA claims identically.  <u>Fasold v. Justice</u>, 409 F.3d
178, 184 (3d. Cir. 2005).  For the sake of simplicity, we will
refer only to the ADEA.

We analyze ADEA disparate treatment claims under the
oft-rehearsed burden-shifting analysis of <u>McDonnell-Douglas Corp.
v. Green</u>, 411 U.S. 792 (1973) and <u>Texas Dep't of Cmty. Affairs v.
Burdine</u>, 450 U.S. 248 (1981).  Under this approach, the plaintiff
must first prove a <u>prima facie</u> case of discrimination.
<u>McDonnell-Douglas</u>, 411 U.S. at 802; <u>St. Mary's Honor Center v.
Hicks</u>, 509 U.S. 502, 506 (1993).  If the plaintiff succeeds, then
the burden shifts to the defendant to "articulate some
legitimate, non-discriminatory reason for the [adverse employment
action.]"  <u>McDonnell-Douglas</u> at 802.  The burden then shifts back
to the plaintiff to show the reason proffered is a pretext for
discrimination.  <u>Id.</u> at 804.

A.    **The Prima Facie Case**

In order to make out a <u>prima facie</u> case for an ADEA
disparate treatment violation, the plaintiff must establish that
"(1) the plaintiff belongs to a protected class; (2) he/she was
qualified for the position; (3) he/she was subject to an adverse

9

employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action." Sarullo v. U.S. Postal Service, 352 F.3d 789, 797 (3d Cir. 2003). VFMA concedes that Lee has made out the first three elements of a prima facie case, but argues that he cannot make out the fourth element.

There are many ways to establish an inference of discriminatory action.  It often depends on the nature of the adverse employment action taken.  If the plaintiff, for example, is denied a promotion, then identifying someone who was promoted and not a member of the protected class will usually suffice to establish the fourth element of the prima facie case.  See e.g., Barber v. CSX Distribution Services, 68 F.3d 694, 698 (3d Cir.1995).  On the other hand, if the plaintiff is claiming failure to hire, plaintiff can point to the employer's hiring of someone not a member of the protected class or the employer's continuing to seek out individuals with the plaintiff's qualifications.  See, e.g., Sarullo, 352 F.3d at 797.  When the plaintiff is discharged as part of layoffs, he can establish the fourth element by showing that the defendant retained a younger, similarly situated employee.  See, e.g., Anderson v. Consol. Rail Corp., 297 F.3d 242, 249-50 (3d Cir. 2001).

10

In general, a plaintiff need not show that he was actually replaced by a younger employee to establish the prima facie case; to do so is a sufficient, but not a necessary, method of establishing the fourth element. Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 347 (3d Cir. 1999). As long as the plaintiff produces evidence from which a reasonable finder of fact could make an inference of discriminatory motive, the plaintiff has established the fourth element. Id. at 355 (all that is required is "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion") (quoting O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996)).

Lee argues that VFMA's contact with Gonzalez is sufficient to establish the fourth element of the prima facie case. But VFMA did not seek out Gonzalez. Gonzalez on his own contacted VFMA to get a job. According to the record, Gonzalez's first attempt to contact VFMA occurred around the time of the November 3, 2006 incident, but that due to computer problems VFMA did not become aware of Gonzalez's interest until about November 10, 2006.[5] Def.'s Mem. Ex. M. This means that VFMA became aware

---

[5]Lee repeatedly asserts that VFMA and Gonzalez were in contact well before VFMA started its investigation of him. Lee

of Gonzalez's interest <u>after</u> it had started its investigation of

Lee.  To hold that Lee has carried his burden to establish the

fourth element on this evidence would mean that an employer

engaged in disciplinary action against an employee could be held

liable for discriminatory discharge if some other person, who is

not a member of the protected class, coincidentally contacts the

employer looking for a job similar to that of the employee.  Such

a rule would subject an employer to possible liability for

discriminatory discharge on the happenstance that it was engaging

in recruitment while disciplinary actions were pending against an

employee.  Put another way, accepting a phone job inquiry after

initiating a disciplinary action would satisfy the requisite

discriminatory inference.

          But this is not the only evidence Lee has proffered to

establish the fourth element.  Lee testified that Charles Kane,

an OIC in his late thirties, had several "altercations" with

cadets, and regularly hurled verbal abuse at cadets, but was not

---

Dep. at 15-17.  Lee testified that OIC Robbins told him that he
(Robbins) had spoken to Gonzalez about Gonzalez's interest in
applying for an OIC job at VFMA.  Lee Dep. at 7-9, 13-14.
Robbins has filed an affidavit stating that no such conversation
took place.  Def.'s Mem. Ex. O.  Regardless of the conflicting
testimony, Lee has presented no evidence that contradicts the
emails which establish that VFMA became aware of Gonzalez's
interest on November 10, 2006.  Def.'s Mem. Ex. M.

dismissed from his job because of it.  Lee Dep. at 67-68, 67-68,
72-73; Doyle Dep. at 64.  This evidence, such as it is, will
suffice to create an inference that VFMA acted with
discriminatory animus at this stage of our analysis.  Simpson v.
Kay Jewelers, 142 F.3d 639, 646 (3d Cir. 1998) (an inference
derived from "a single member of a non-protected group [being]
treated more favorably than one member of the protected
group...may be acceptable at the prima facie stage of the
analysis").

      B.    **Pretext**

        Turning to the question of pretext, a plaintiff must
present some evidence by which a reasonable factfinder could
either "(1) disbelieve the employer's articulated legitimate
reasons; or (2) believe that an invidious discriminatory reason
was more likely than not a motivating or determinative cause of
the employer's action."  Fuentes v. Perskie, 32 F.3d 759, 764 (3d
Cir. 1994).  Under the Fuentes test, a plaintiff cannot rest on
the same evidence provided during the prima facie stage because
the analysis there is based on "on a few generalized factors" and
the burden is "not onerous."  Simpson, 142 F.3d at 646 (internal
quotations omitted).  We examine the evidence plaintiff presents

13

to undermine the employer's proffered nondiscriminatory reason with greater precision at the pretext stage because "the factual inquiry into the alleged discriminatory motives of the employer has risen to a new level of specificity." Id.

A plaintiff can establish pretext by showing that similarly situated individuals who are not members of the protected class were treated more favorably than the plaintiff was. Fuentes, 32 F.3d at 765. When the question of pretext focuses on the employer's treatment of similarly situated non-members of the protected class, we concentrate "on the particular criteria or qualifications identified by the employer as the reason for the adverse action." Simpson, 142 F.3d at 647.

To satisfy this burden, a plaintiff "must point to evidence from which a factfinder could reasonably infer that the plaintiff satisfied the criterion identified by the employer or that the employer did not actually rely on the stated criterion." Id. To be similarly situated, the other employee must hold the same position as the plaintiff and be subject to the same circumstances. Krouse v. American Sterilizer Co., 126 F.3d 494, 504 (3d Cir. 1997) (in an ADA case, the Court examined the type of position comparator held, the nature of the injury comparator suffered, and how it affected the comparator's ability to do his

14

job as a channel welder, and found that plaintiff and comparator were not similarly situated because they were not sufficiently similar in terms of the latter two considerations).  Determining whether another employee is similarly situated is a fact-specific inquiry but one still amenable to resolution at the summary judgment stage.  See Simpson, 142 F.3d at 645-47.

Here, the proffered legitimate reason for terminating Lee was "[h]e used extremely poor judgment in getting embroiled with this agitated young person."  Doyle Dep. at 41.  Specifically, VFMA does not fault Lee for initially confronting the cadet, but does blame him for provoking the cadet rather than using a more pacific tactic.[6]  Id. at 41-44; see also Def.'s Mem. Ex. H, I (statements of witnesses).  According to VFMA, the appropriate action upon finding the cadet in such an agitated state would have been to contact the closest Tactical Officer (available nearly instantaneously via handheld two-way radios), rather than continuing the confrontation with the cadet, or, if

---

[6]In doing so, VFMA elected to believe the evidence provided by the cadet, his roommate, and other witnesses, rather than Lee's version of events.  We consider this decision only in terms of VFMA's articulation of its proffered nondiscriminatory reason. VFMA's decision to credit the cadets' statements was a business judgment and, as such, we examine it to determine whether it was an attempt to hide "discriminatory animus...not whether [it was] wise, shrewd, prudent, or competent."  Fuentes, 32 F.3d at 765.

all else failed, to walk away.  Doyle Dep. at 44-50.  In sum,
VFMA terminated Lee because of his specific reaction to a very
specific situation, and not as a consequence of a general concern
about physical altercations between OICs and cadets.

Lee argues that VFMA's proffered reason should not be
believed because other, similarly situated, but younger, VFMA
employees had "altercations" with cadets and VFMA did not
terminate them.  Lee points to several incidents.  Lee testified
that OIC Robbins had a heated verbal argument with some college
cadets, but was never fired.  Lee Dep. 68-69.  However, this
particular incident did not result in physical contact between
the cadet and the OIC -- a most material difference -- and thus
cannot be considered similarly situated.  The same is true of the
cadets-in-the-shower incident about which Lee testified OIC Kane
told him.  Id. at 67-68.  The "pizza incident," though quite
colorful, involves no physical contact between OICs and cadets
similar to what occurred in the November 3, 2006 incident.  Id.
at 69-70.

Lee does present evidence that could satisfy the
Fuentes test: OIC Kane's reported "altercations" with cadets and
other employees, id. at 67-68, 72-74.  But Lee fails to provide
sufficient evidence to meet his burden to establish that he and

16

Kane were indeed similarly situated.  To determine whether two people are similarly situated for these purposes, we first focus on the employer's proffered nondiscriminatory reason and the criteria for the adverse employment action which the proffered reason incorporates.  <u>Simpson</u>, 142 F.3d at 647.

Here, VFMA specified that it was Lee's reaction to, and provocation of, an agitated cadet that made Lee's judgment suspect in VFMA's eyes.  For Lee to establish that VFMA's proffered reason is not credible because VFMA treated Kane differently, Lee must present evidence that would allow a reasonable finder of fact to decide that the instances involving Kane were sufficiently similar to Lee's altercation with the cadet on November 3, 2006.  <u>See</u> <u>Krouse</u>, 126 F.3d at 504.

But such information is lacking in this record.  All we have is Lee's hearsay report that Kane told him he got into "altercations" with cadets.[7]  But we have no evidence regarding the specifics of these incidents.  We are entirely in the dark about their context, the specifics of Kane's interactions with the cadets -- <u>e.g.</u>, whether they involved physical contact -- and

---

[7] Notably, neither side deposed Kane.

17

the precise outcomes of each incident.[8]  Although Lee's assertions were (barely) sufficient to establish his <u>prima</u> <u>facie</u> case, the jurisprudence requires a heightened level of specificity at this stage of the analysis.  Absent this additional information, Lee has not carried his burden to establish that his November 3 experience with the cadet and OIC Kane's "altercations" were sufficiently similar.  Put another way, there is no record here that Lee was similarly situated to Kane that would allow us to hold that a reasonable jury could infer pretext from a hearsay report that is founded upon a word as amorphous as <u>altercation</u>.

Lee has, in short, failed to present evidence that undermines VFMA's proffered nondiscriminatory reason.  We will therefore grant VFMA's motion for summary judgment.

---

[8] Indeed, Lee's choice of the word <u>altercation</u> could involve either "a noisy dispute" or "a wrangle." I <u>Oxford</u> <u>English</u> <u>Dictionary</u> 366, col. 2, def. 2 (2nd ed. 1989); <u>see</u> <u>also</u> <u>id.</u> at def. 1 ("The action of disputing in warmth or anger; wordy strife, wrangling.").

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID LEE | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| VALLEY FORGE MILITARY ACADEMY | : | NO. 08-527 |

<u>ORDER</u>

AND NOW, this 14th day of November, 2008, upon consideration of defendant Valley Forge Military Academy's motion for summary judgment (docket entry #18) and the plaintiff's response, it is hereby ORDERED that:

1.   The defendant's motion is GRANTED; and

2.   The Clerk of Court shall CLOSE this case statistically.


BY THE COURT:

<u>/s/ Stewart Dalzell, J.   </u>

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DAVID LEE                          :          CIVIL ACTION
                                   :
        v.                         :
                                   :
VALLEY FORGE MILITARY ACADEMY :          NO. 08-527

<u>JUDGMENT</u>

         AND NOW, this 14th day of November, 2008, in accordance
with the accompanying Memorandum and Order, and the Court having
this day granted defendant's motion for summary judgment,
JUDGMENT IS ENTERED in favor of defendant Valley Forge Military
Academy and against plaintiff David Lee with each side to bear
its own costs.


                                   BY THE COURT:

                                   /s/ Stewart Dalzell, J.